IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 09-00385-01-CR-W-DGK |
| DIONTE I. HARRIS, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on two motions: (1) Motion to Suppress Evidence Obtained in Illegal Search (doc #18); and (2) Motion to Suppress Video Obtained From KSHB TV (doc #19). For the reasons set forth below, it is recommended that these motions be denied.

I. INTRODUCTION

On December 15, 2009, the Grand Jury returned a one count indictment against defendant Dionte I. Harris. The indictment charges that on June 17, 2008, defendant Harris, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm.

On March 9, 2010, an evidentiary hearing was held on defendant's motion to suppress. Defendant Harris was represented by appointed counsel Michael Walker. The Government was represented by Assistant United States Attorney Christina Tabor. The Government called Officer Charles Williams, Officer Jeffery Hughley, Sergeant James Rubenstein and Officer Maximus Taylor of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

    1.        On June 17, 2008, Officer Charles Williams was on patrol with his partner Aaron Kohrs in a marked police vehicle. (Tr. at 4-5) Officer Williams testified that he

observed a Mercury Sable come off I-70 eastbound onto Independence Avenue. (Tr. at 8) The vehicle attracted the officer's attention because it did not have its headlights on (it was approximately 9:07 p.m.) and it changed lanes two or three times in a very short period of time, weaving between cars at a speed too fast for conditions. (Tr. at 9-10; Defendant's Ex. 2) Both operating the vehicle without its headlights on and weaving between the lanes of traffic constitute traffic violations and pose a hazard to others on the roadway. (Tr. at 9-10) Officer Williams testified that the manner in which the vehicle was being operated is often indicative of someone who is intoxicated and/or attempting to elude police. (Tr. at 10)

2. Officer Williams activated the emergency lights on top of his police vehicle to conduct a "traffic violation" (a stop) for driving with no headlights, weaving in and out of traffic and driving too fast for conditions. (Tr. at 11, 39) The police vehicle was immediately behind the Mercury Sable when Officer Williams activated his emergency lights. (Tr. at 11) The driver of the vehicle did not pull over. (Tr. at 11) Officer Williams then turned on the siren and the spotlight in an attempt to get the driver's attention. (Tr. at 11) The driver did not stop. (Tr. at 12) After approximately three blocks, the driver of the vehicle turned into a 7-Eleven and pulled up to one of the pumps, as if to pump some gas into the vehicle. (Tr. at 12) The officers could see two occupants in the vehicle. (Tr. at 12)

3. When the vehicle came to a stop, the officers conducted a "felony car check." (Tr. at 14) A "felony car check" is a term officers use when there is heightened suspicion. (Tr. at 14-15) It does not necessarily mean that a felony has been committed. (Tr. at 40) Officer Williams testified that there was heightened suspicion in this instance because of the evasive driving with no headlights and the fact that it took three blocks for the vehicle to pull over. (Tr. at 15) In a "felony car check," officers get the driver and passengers out, get them in handcuffs and then investigate further. (Tr. at 15)

4. The police vehicle was stopped immediately behind the Mercury Sable. (Tr. at 15) Officer Williams exited his vehicle and while standing behind the open door of the police vehicle gave very loud verbal commands for the driver of the Mercury to shut the vehicle off and put his hands out the window so the officer could see them. (Tr. at 15-16) The driver did not respond to the officer's commands. (Tr. at 16) Officer Williams could see the driver leaning forward and then reaching back behind his seat. (Tr. at 16, 51) Officer Williams continued to instruct the driver to shut the vehicle off and show his hands. (Tr. at 16) Officer Williams was concerned that the driver was attempting to get a gun or hiding contraband such as alcohol, narcotics or firearms. (Tr. at 17)

5. Eventually the driver turned off the vehicle, opened the driver's door and stepped out of the vehicle. (Tr. at 18) The driver staggered to the right and to the left. (Tr. at 19-20) Officer Williams instructed the driver to face away from him and show his hands, but the driver did neither. (Tr. at 18) The driver faced Officer Williams and Williams could not see both of his hands. (Tr. at 19) Officer Williams continued to instruct the driver to face away from him and show his hands. (Tr. at 19) The driver still did not comply. (Tr. at 19) Officer Williams testified that the driver had a dazed look, as if he was under the influence of alcohol and/or drugs. (Tr. at 19) The driver look over his shoulder two or three times. (Tr. at 20) The driver eventually showed his hands and Officer Williams could see that he did not have a weapon. (Tr. at 20) Officer Williams again instructed the driver to face away from him, but again the

driver did not comply. (Tr. at 20) The driver stumbled to his right and then left in Officer Williams' direction. (Tr. at 20) The driver eventually came to the rear of his vehicle and sat down. (Tr. at 21)

6. Officers Williams and Kohrs observed a small child standing in the backseat of the vehicle moving back and forth as the driver was stepping out of the vehicle. (Tr. at 23, 50) The two-year-old child was unsecured in the backseat. (Tr. at 23-24) There was no child safety seat in the backseat of the vehicle. (Tr. at 46, 72) Officer Williams testified that the driver of the vehicle put the child at substantial risk by having him unrestrained in the rear seat of the vehicle as it was weaving in and out of traffic. (Tr. at 52) Endangering the welfare of a child is a potential felony charge in Missouri. (Tr. at 52)

7. Officer Kohrs instructed the passenger of the vehicle to step out of the vehicle and face away. (Tr. at 21) The passenger complied. (Tr. at 21) The driver and passenger were handcuffed. (Tr. at 21)

8. The driver (identified as Dionte Harris) and the passenger (identified as Antwaine Haynes) were placed under arrest and taken into custody. (Tr. at 25, 29) Harris was arrested for careless driving and for operating a vehicle under the influence of alcohol or drugs. (Tr. at 26; Defendant's Exs. 3 and 9) Haynes was arrested on an outstanding warrant. (Government's Ex. 3)

9. Officer Williams testified that an inventory search of the vehicle was conducted. (Tr. at 22) According to Officer Williams, the vehicle was going to be towed because it could not be left parked at a gas pump at 7-Eleven. (Tr. at 25, 43) Officer Williams prepared a Tow-In Report. (Tr. at 32; Government's Ex. 17)

10. Other officers responded to the scene, including Officer Jeffery Hughley. (Tr. at 21, 62) Officer Hughley testified that the arresting officers had advised him that prior to the suspect exiting the vehicle, he had done a lot of movement inside the vehicle and had been hesitant to get out. (Tr. at 63) Officer Williams testified that based on defendant Harris' actions before he exited the vehicle (that is leaning forward and then reaching back behind), the officer suspected that there could be alcohol, narcotics and/or firearms within Harris' immediate reach. (Tr. at 22) Further, Officer Williams testified that the manner in which Harris operated the vehicle (that is weaving through several lanes of traffic) was consistent with the driver being intoxicated. (Tr. at 22-23) Officer Hughley searched the vehicle looking for any contraband, such as drugs or weapons, that the driver could have stored within a reach or a lunge. (Tr. at 63-64) Officer Hughley testified that he was not conducting an inventory search. (Tr. at 67) Officer Hughley testified that he had reasonable suspicion that the driver was trying to stuff contraband. (Tr. at 66) Officer Hughley recovered a loaded .357 revolver wrapped in a t-shirt from the floorboard immediately behind the driver. (Tr. at 28, 49, 64-65) The gun was not underneath the driver's seat. (Tr. at 68) Either the driver or the passenger could have reached the firearm. (Tr. at 49-50, 69) Four more rounds were located in a compartment between the driver and passenger seat. (Tr. at 65) Officer Hughley's search took place after defendant Harris was under arrest. (Tr. at 72)

11. Officer Kohrs contacted the Robbery Unit and was advised that defendant Harris was a convicted felon. (Tr. at 26-27) Harris was informed that he was facing additional charges of being a felon in possession of a firearm. (Tr. at 28)

3

12. Officer Maximus Taylor, the transport wagon driver, responded to the scene at approximately 9:11 p.m. (Tr. at 97-98) Officer Taylor loaded defendant Harris and Antwaine Haynes into the wagon. (Tr. at 101-02) Defendant Harris requested that the exterior door to the wagon be left open because it was hot. (Tr. at 106-07)

13. Sergeant James Rubenstein, a field supervisor at the time, responded to the scene because people directly working for him were involved. (Tr. at 74) As a supervisor, Sergeant Rubenstein's responsibility was to make sure that everything runs smooth, answer any questions the officers might have and make sure the proper people get notified. (Tr. at 75) Sergeant Rubenstein observed a television reporter and camera crew off to the side and waved them over. (Tr. at 75-76, 83) Sergeant Rubenstein testified that it is not unusual to see a television camera crew respond to a car stop; it has happened thousands of times in his career. (Tr. at 76) Sergeant Rubenstein spoke to the reporter, Russ Ptacek of Channel 41, and told him that this would probably be a good story for him. (Tr. at 76) Sergeant Rubenstein told Ptacek that the officers had been in a short car pursuit and that when the guys stopped, there was a two-year-old unrestrained sitting right next to a gun and that the officers thought the driver was on PCP. (Tr. at 77)

14. An ambulance was called for Antwaine Haynes. (Tr. at 70, 106) Haynes was experiencing chest pains. (Tr. at 106)

15. Sergeant Rubenstein was present when Russ Ptacek questioned defendant Harris while Harris was in the transport vehicle. (Tr. at 77-78) Russ Ptacek was dressed in a coat and tie, as opposed to the police officers who were in uniform. (Tr. at 78) Harris asked Sergeant Rubenstein who the person was (referring to the reporter) and Rubenstein responded that he was with the news. (Tr. at 78-79) The door to the transport vehicle was already open when Sergeant Rubenstein and the reporter approached the vehicle. (Tr. at 84) Sergeant Rubenstein testified that there is no policy prohibiting the media from asking questions of people under arrest as long as the media is not in an area that is roped off. (Tr. at 95)

16. Sergeant Rubenstein and Officer Taylor each testified that the reporter interviewed defendant Harris twice while Harris was in the transport vehicle. (79-80, 135) The first interview contained the following dialogue:

> REPORTER: Yeah, I'm curious as to why that child was so close to a gun.
>
> HARRIS: I don't know nothin' about no gun.
>
> REPORTER: The gun that was in the car right next to the child. I'm curious as to why that was.
>
> HARRIS: I don't know nothing about no weapon officer.
>
> REPORTER: You don't know ... You didn't realize there was a weapon in your car next to your little boy?
>
> HARRIS: I don't know what you are talking about. ... Who are you?

4

| | | |
|---|---|---|
| RUBENSTEIN: | | He's with the news. |
| HARRIS: | | The news. |

(Government's Ex. 3 at 21:32:58 to 21:33:21) The second interview consisted of the following dialogue:

| | | |
|---|---|---|
| REPORTER: | | But what I wanna know is why was that kid in your backseat next ta a gun. |
| HARRIS: | | Providing protection for my family. |
| REPORTER: | | The kid is sitting next to a gun in your backseat and that you think helps protect your family? |
| HARRIS: | | No, sir.  But I had the gun .... |

(Government's Ex. 1)[1]  Sergeant Rubenstein testified that he did not direct the reporter to ask Harris questions. (Tr. at 78) Officer Williams testified that he did not direct the reporter to ask Harris any specific questions. (Tr. at 29) Officer Taylor testified that he did not direct the reporter to ask Harris any questions nor did he hear any other officer direct the reporter to ask questions. (Tr. at 110, 121) Officer Taylor further testified that he did not open the exterior door of the wagon for the purpose of allowing the reporter to question Harris. (Tr. at 111) Officer Taylor did not see any other police officer open the door so that the news crew could have access to Harris. (Tr. at 138)

17. Officer Taylor testified that defendant Harris spoke to Sergeant Rubenstein repeatedly asking why he was under arrest and things like that. (Tr. at 108)

18. The video tape from the dash-cam of the police vehicle driven by Officer Williams was destroyed after the conclusion of the DUI and child endangerment processing of the case. (Tr. at 139)

### III. DISCUSSION

A.  Motion to Suppress Evidence Obtained in Illegal Search (doc #18)

Defendant Harris seeks to suppress "evidence obtained as a result of the illegal and unconstitutional search of the vehicle Defendant was driving." (Motion to Suppress Evidence Obtained in Illegal Search (doc #18) at 1) In support of his motion, defendant argues that the search was conducted as a "Felony Car Check." (Id.) Defendant argues that to justify a search of a vehicle,

---

[1] This interview does not appear on the recording being made on the transport wagon's VHS system (Government's Ex. 3). (Tr. at 114) Officer Taylor testified that the interview took place sometime during the gap in the tape from 21:38:53 to 21:47:32. (Tr. at 112-14, 127) The VHS system was old and sensitive to heat and apparently malfunctioned during the time this interview took place. (Tr. at 104, 113)

an officer must have an articulable suspicion that a person has committed a crime or is about to commit a crime. (Id. at 2) In Arizona v. Gant, 129 S.Ct. 1710 (2009), the United States Supreme Court found unconstitutional a search incident to arrest when the arrestee had been secured and could not access the interior of the vehicle. Defendant contends that since he had been made to exit the vehicle and lie on the ground prior to the search, a search incident to arrest was unconstitutional. (Motion to Suppress Evidence Obtained in Illegal Search (doc #18) at 4) Defendant further argues that the search cannot be justified as an inventory search as the tow truck was not ordered until after the search took place. (Id. at 3)

The initial stop of defendant Harris' vehicle was lawful. As the Eighth Circuit Court of Appeals has observed, "a traffic violation–however minor–creates probable cause to stop the driver of the vehicle." United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003); United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000). Prior to pulling the vehicle over, the officers observed the vehicle being driven with no headlights, weaving in and out of traffic and going too fast for conditions. (See Fact No. 1, supra) These traffic violations provided probable cause to stop the vehicle.

The manner in which the vehicle was being operated appeared to the officers to be indicative of someone who was intoxicated and/or attempting to elude police. (See Fact No. 1, supra) Defendant Harris failed to pull over when the officers attempted to stop the vehicle. (See Fact No. 2, supra) After a three-block chase, Harris pulled up to a gas pump at a gas station. (Id.) Harris ignored Officer Williams' commands to turn off the vehicle and show his hands. (See Fact No. 4, supra) Officer Williams could see Harris leaning forward and then reaching back behind his seat. (Id.) Officer Williams was concerned that Harris was attempting to get a gun or hiding contraband. (Id.) When Harris finally exited the vehicle, he staggered and continued to ignore Officer Williams' commands. (See Fact No. 5, supra) Officer Williams testified that Harris had a dazed look, as if he was under the influence of alcohol and/or drugs. (Id.) The officers observed a small child unsecured in the backseat of the vehicle. (See Fact No. 6, supra)

6

The Court finds that the officers had probable cause to place defendant Harris under arrest. The search of the vehicle which followed was permissible under various exceptions to the warrant requirement: (1) under the automobile exception to the warrant requirement;[2] (2) as a search incident to arrest;[3] and (3) as an inventory search.[4]

The Court acknowledges that where there is no possibility that an arrestee could reach into his vehicle and obtain a weapon, there is no longer authority for police to search a vehicle for weapons as a search incident to arrest given the Supreme Court's decision in Arizona v. Gant, 129 S.Ct. 1710 (2009). However, various courts have found that for searches conducted prior to the Gant decision, like the search at issue here, the previous state of the law controls as officers were operating in good faith reliance on the law as it existed prior to Gant. See United States v. McCane, 573 F.3d 1037, 1044 (10th Cir. 2009)("a police officer who undertakes a search in reasonable

---

[2] The automobile exception to the warrant requirement allows officers to search a vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband or other evidence of a crime. See United States v. Brown, 550 F.3d 724, 727 (8th Cir. 2008). In United States v. Martinez-Cortes, 566 F.3d 767, 771 (8th Cir. 2009), the court found that when occupants of a vehicle did not promptly comply with orders to put the vehicle in park and show their hands and Martinez-Cortes moved his arms as if to hide something between his leg and the car's console, officers had probable cause to believe that criminal activity was afoot and were justified in searching those areas of the vehicle where a weapon or contraband might be hidden. As in Martinez-Cortes, defendant Harris failed to comply with orders to shut the vehicle off and put his hands out the window and instead leaned forward and then reached back behind his seat as if hiding something. (See Fact No. 4, supra) Given Harris' actions, the officers had probable cause to believe that criminal activity was afoot and that the vehicle contained evidence of a crime. See also United States v. Evans, 2009 WL 2230924, *5 (C.D. Cal. July 23, 2009) (defendant's furtive movements during traffic stop gave officer probable cause to believe that vehicle contained contraband and justified search of vehicle pursuant to automobile exception to warrant requirement).

[3] See New York v. Belton, 453 U.S. 454, 460 (1981)("we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile"); United States v. Barnes, 374 F.3d 601, 603-04 (8th Cir. 2004), cert. denied, 543 U.S. 1079 (2005).

[4] A warrantless inventory search of a vehicle is valid if it is conducted pursuant to standardized police procedures and not done in bad faith or for the sole purpose of investigation. See Colorado v. Bertine, 479 U.S. 367, 372 (1987). As set forth above, defendant Harris and the passenger, Antwaine Haynes, had been placed under arrest. (See Fact No. 8, supra) The vehicle needed to be towed because it could not be left parked at a gas pump at 7-Eleven. (See Fact No. 9, supra) Officer Williams testified that an inventory search of the vehicle was conducted and that he prepared a Tow-In Report. (Id.)

reliance upon the settled case law of a United States Court of Appeals, even though the search is later deemed invalid by Supreme Court decision, has not engaged in misconduct"); United States v. Lee, 2009 WL 3762404, *2 (W.D. Mo. Nov. 10, 2009)("the good faith of officers relying on pre-Gant precedent supports a search otherwise indefensible under Gant"); United States v. Allison, 637 F.Supp.2d 657, 672 (S.D. Iowa 2009)(no suppression where search made incident to arrest adhered to and was made in objectively reasonable reliance upon the Eighth Circuit doctrine controlling at the time).

In addition, the Gant court justified a search incident to arrest if it is reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle. See Arizona v. Gant, 129 S.Ct. 1710, 1719 (2009). Defendant Harris was arrested for careless driving and for operating a vehicle under the influence of alcohol or drugs. (See Fact No. 8, supra) Officer Williams testified that the manner in which Harris operated the vehicle (that is weaving through several lanes of traffic) was consistent with the driver being intoxicated. (See Fact No. 10, supra) Further, Officer Williams observed Harris leaning forward and then reaching back behind his seat as if hiding contraband. (See Fact No. 4, supra) Finally, Officer Williams testified that Harris had a dazed look, as if he was under the influence of alcohol and/or drugs. (See Fact No. 5, supra) Officer Williams' observations of Harris' behavior gave him a reasonable basis to believe that evidence relevant to Harris' intoxication (such as bottles containing alcohol or drug paraphernalia) might be found in the vehicle. See United States v. Tinsley, 2010 WL 681328, *2 (8th Cir. Mar. 1, 2010)(warrantless search of vehicle incident to arrest proper under Gant where officers' observations of defendant's behavior coupled with strong odor of alcohol gave reasonable basis to believe that evidence relevant to Tinsley's intoxication (such as bottles containing alcohol) might be found in vehicle).

Given the Court's finding that the initial stop of the vehicle, the subsequent arrest of defendant Harris and the search were proper, there is no basis for suppressing the firearm.

B. Motion to Suppress Video Obtained From KSHB TV (doc #19)

Defendant seeks to suppress "all evidence of a video/audio recording of questioning of

8

Defendant by a news team, while Defendant was in police custody." (Motion to Suppress Video Obtained From KSHB TV (doc #19) at 1) In support of his motion, defendant argues that "a Kansas City police officer opened the read [sic] door of the wagon to permit a news team from KSHB TV access to Defendant." (Id.) Defendant further argues that "[w]hen the police became directly involved by opening the wagon door to allow Mr. Ptacek access to Defendant for questioning, Mr. Ptacek became an undisclosed implied government agent and the Miranda safeguards applied." (Id. at 3)

Contrary to defendant's argument, the evidence presented at the hearing shows that the police did not open the wagon door to allow the reporter access to defendant for questioning. Rather, defendant Harris requested that the exterior door to the wagon be left open because it was hot. (See Fact No. 12, supra) The door to the transport vehicle was already open when the reporter approached the vehicle. (See Fact No. 15, supra) Officer Taylor, the officer driving the transport wagon, testified that he did not open the exterior door of the wagon for the purpose of allowing the reporter to question Harris nor did he see any other police officer open the door so that the news crew could have access to Harris. (See Fact No. 16, supra)

Miranda warnings are required whenever a person is subjected to "custodial interrogation," which is defined as "questioning initiated by law enforcement officers after a person has been taken into custody." Miranda v. Arizona, 384 U.S. 436, 444 (1966). As set forth in Illinois v. Perkins, 496 U.S. 292, 296-97 (1990), it is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation, whereby the suspect may feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess. While defendant Harris was in custody at the time he was questioned by the news reporter, the questioning was not initiated by law enforcement officers. Sergeant Rubenstein, Officer Williams and Officer Taylor each testified that they did not direct the reporter to ask Harris any questions. (See Fact No. 16, supra) Officer Taylor also testified that he did not hear any other officer direct the reporter to ask questions. (Id.) Further, prior to making the incriminating

statement, defendant Harris had been advised that the person asking the questions was with the news. (See Fact No. 16, supra) Where "[a]ll questioning was done by private citizens, members of the news media who defendant had no reason to believe were law enforcement officers[,] ... Miranda warnings were not required ...." State v. Kerby, 833 N.E.2d 757, 772 (Ohio Ct. App. 2005). Defendant's motion to suppress the video/audio recording of questioning of defendant by a news team must be denied.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Harris' Motion to Suppress Evidence Obtained in Illegal Search (doc #18). It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Harris' Motion to Suppress Video Obtained From KSHB TV (doc #19).

Counsel are reminded they have fourteen days after being served a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                                */s/ Sarah W. Hays*
                                                                   SARAH W. HAYS
                                      UNITED STATES MAGISTRATE JUDGE